UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SHAVON ROBINSON, | CASE NO. 5:21-CV-01921-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Shavon Robinson filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 12, 2021, pursuant to Local Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry of Oct. 12, 2021). Subsequently, the parties consented to my exercising jurisdiction over this case pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #12). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Robinson filed for SSI on April 17, 2019, alleging a disability onset date of March 17, 2019. (Tr. 427). Her claims were denied initially and on reconsideration. (Tr. 345, 361). She then

1

requested a hearing before an Administrative Law Judge. (Tr. 376-78). Ms. Robinson (represented

by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on July 30, 2020.

(Tr. 306-29). On September 22, 2020, the ALJ issued a written decision finding Ms. Robinson not

disabled. (Tr. 289-99). On August 23, 2021, the Appeals Council denied Ms. Robinson's request

for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7; *see* 20

C.F.R. §§ 416.1455, 416.1481). Ms. Robinson timely filed this action on October 12, 2021. (ECF

#1).

FACTUAL BACKGROUND

I.      PERSONAL AND VOCATIONAL EVIDENCE

Ms. Robinson was born in 1973, and was 46 years old at the time of her alleged onset date

and 47 years old at the time of the administrative hearing. (Tr. 427). Ms. Robinson completed her

GED in 1998 and received her Associate Degree in Business in 2018. (Tr. 1300). In the past, Ms.

Robinson has been employed an administrative assistant and a home health aide (*Id.*).

II.     ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Robinson and VE Marne South, presented

during the hearing before the ALJ.

Ms. Robinson was born in 1973 and lives in Stow, Ohio. (Tr. 306). Her 18-year-old son

lives with her. (Tr. 311). In March 2019, Ms. Robinson suffered a stroke affecting the right side of

her body. (Tr. 310). She continues to have right-sided weakness and swelling in the upper and

lower extremity, uses a brace to address right foot drop, and uses a cane for prolonged periods of

standing and walking and when she leaves the house for doctor's appointments. (*Id.*, Tr. 314).

Swelling in her right leg and hand occurs about once a week and takes several days to diminish.

(Tr. 315, 318). The swelling in Ms. Robinson's hand is not as bad as in her foot, but it does cause issues with her ability to grip with her right hand. (*Id.*). Mr. Robinson can be on her feet for about ten or fifteen minutes before she needs a break to relieve the pain in her leg. (Tr. 316). She also estimates she can sit for ten to fifteen minutes. (*Id.*). When her leg swells, she is able to walk on it but must move very slowly because the swelling affects her balance. (Tr. 323).

Since the stroke, Ms. Robinson endorses being very forgetful and has difficulty finding words. (Tr. 317). Her blood pressure is sometimes high and causes severe headaches and some dizziness. (Tr. 318). Ms. Robinson experiences headaches about once a week, which coincide with the arm and leg swelling. (*Id.*).

On a good day, Ms. Robinson will get up, go to a doctor's appointment if she has one scheduled, and then nap when she gets home. (Tr. 320). Then, she will try to do things around the house. (*Id.*). Ms. Robinson must spread her chores out over the week because she is unable to handle doing it all at the same time. (*Id.*). On a bad day, Ms. Robinson struggles to do anything. (Tr. 322).

Ms. Robinson takes blood pressure and cholesterol medication, famotidine for stomach pain, a medication to address frequent muscle spasms, and uses two different inhalers. (Tr. 312). The muscle relaxer makes her extremely groggy and sometimes puts her to sleep. (Tr. 316). She naps during the day because the muscle spasms keep her awake at night. (Tr. 319). Ms. Robinson has tried ice and heat for relief, but neither are effective. (Tr. 318).

The VE then testified. The ALJ identified Ms. Robinson's past relevant work as a payroll clerk and queried the VE if a hypothetical individual of Ms. Robinson's age, education, and work history could perform as a payroll clerk if subject to the following limitations: the individual can

3

lift, carry, push, and pull ten pounds occasionally, five pounds frequently; can sit for six hours and walk and/or stand for two hours in an eight-hour workday; occasionally operate foot controls bilaterally; never climb ladders ropes or scaffolds; occasionally climb ramps and stairs; frequently balance, stoop, and crouch; occasionally kneel and crawl; must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; limited to simple routine tasks that do not involve arbitration, negotiation, or confrontation; cannot direct the work of others; cannot be responsible for the safety and welfare of others; and cannot perform piece rate work or assembly line work. (Tr. 346-47). The VE responded such an individual could not perform Ms. Robinson's past relevant work but identified other positions the individual could perform, including ink printer (DOT 652.658-038), SVP 2, sedentary exertion, with an estimated 17,000 jobs nationally; table worker (DOT 739.687-182), SVP 2, sedentary exertion, with an estimated 57,000 jobs nationally; and dial marker (DOT 729.684-018), SVP 2, sedentary exertion, with an estimated 7,000 jobs nationally. (Tr. 347).

If the hypothetical individual were further limited to sitting for three hours a day and standing and walking to one hour a day in five-minute increments, the individual would not be able to perform any of the identified positions. (Tr. 347-48). The VE testified employers tolerate no more than a ten percent off-task rate and no more than one absence per month. (Tr. 348). The need for an individual to elevate her legs during the workday is work preclusive. (*Id.*).

III.    RELEVANT MEDICAL EVIDENCE

On March 17, 2019, Ms. Robinson presented at the emergency department with right-sided extremity numbness and weakness with slurred speech. (Tr. 722). An MRI of Ms. Robinson's brain revealed an acute infarct (stroke). (*Id.*; Tr. 790). On arrival to the emergency department, Ms.

Robinson's blood pressure was high, 251/113. (Tr. 715). Ms. Robinson was admitted to the hospital, and, over the course of six days, her blood pressure decreased with initiation of a multiple antihypertensive regimen. (Tr. 728-29). During her hospital stay, Ms. Robinson was assessed by a physical therapist, who noted Ms. Robinson displayed reduced strength in the right lower extremity (Tr. 532) and an altered gait with slow cadence and deviation to the right side due to right-sided weakness (Tr. 533). She was able to pick up a pen off the floor "but had to take her time and had some difficulty due to [right] sided weakness." (*Id.*). Ms. Robinson completed standing reaches with the left arm but struggled with her right arm. (*Id.*). Otherwise, Ms. Robinson showed cognition within normal limits and had active right upper extremity range of motion in the shoulder and elbow. (Tr. 532). Ms. Robinson also displayed mild to moderate dysarthria, where she slurred some words but could be understood with some difficulty. (Tr. 560).

During an inpatient therapy session on March 20, 2019, Ms. Robinson was "very unsteady ambulating," displaying bilateral weakness in the hip abductors, poor balance, and decreased step length. (Tr. 575). The physical therapist noted Ms. Robinson reached for walls for support during gait testing and had several loss-of-balance episodes requiring assistance. (*Id.*). She showed slow cadence, decreased step height, decreased arm swing, deviated path, and decreased step length. (Tr. 576). The physical therapist noted Ms. Robinson had decreased functional mobility, decreased balance and coordination, decreased range of motion, and decreased strength. (*Id.*). She displayed significantly decreased right upper extremity strength. (*Id.*). Due to her "very unsteady" gait and poor strength, the therapist recommended Ms. Robinson be discharged to a facility for additional therapy before being released to home. (*Id.*). Therapy notes indicate increased fatigue after Ms.

Robinson stood for approximately three minutes in front of the sink for grooming activities. (Tr. 580). She was unable to use her right arm for fine or gross motor skills. (Tr. 581).

Also on March 20th, Ms. Robinson underwent an occupational therapy initial assessment that revealed decreased functional mobility, balance, endurance, strength, fine motor control, range of motion, and coordination. (Tr. 579). The therapist noted Ms. Robinson displayed "very little" range of motion, strength, and coordination of the right upper extremity, Ms. Robinson's dominant hand. (Id.). The occupational therapist felt Ms. Robinson should not be discharged home, but to a rehabilitation level facility. (Id.).

On March 23, 2019, Ms. Robinson was discharged from the hospital to a skilled nursing facility for further rehabilitation. (Tr. 728). She received physical, occupational, and speech therapy during her stay. (Tr. 1173-1220). At the physical therapy evaluation on March 24, 2019, Ms. Robinson displayed diminished right leg strength (1/5) and hypotonic muscle tone. (Tr. 1174-75). Gait analysis showed foot drop, decreased stride length and cadence, decreased accuracy of movement, ataxic gait, and abnormal posture. (Tr. 1175). During a 200-foot walk on a level surface, Ms. Robinson lost her balance four times and showed fatigue. (Id.). On March 29, 2019, Ms. Robinson continued to display balance deficits, decreased dynamic balance, decreased functional activity tolerance, strength impairments, and unilateral weakness. (Tr. 1180). Discharge notes indicate Ms. Robinson made progress with skilled interventions and demonstrated increased stability with a foot brace. (Tr. 1189).

During Ms. Robinson's occupational therapy evaluation on March 25, 2019, she displayed impaired range of motion and diminished strength in the right upper extremity. (Tr. 1192). Fine and gross motor coordination were impaired. (Tr. 1193). Throughout her hospital stay, Ms.

Robinson displayed improved right hand coordination during testing, but continued to have decreased right upper extremity strength and right-handed grip strength. (Tr. 1206). Ms. Robinson also showed a slight increase in her ability to maintain standing balance without support. (*Id.*). Upon discharge, treatment notes indicated Ms. Robinson could independently eat, brush her teeth, toilet, dress, wash, and don/doff footwear, but needed supervision to shower or bathe herself. (Tr. 1209).

On March 27, 2019, Ms. Robinson underwent a speech therapy evaluation. (Tr. 1210-215). A motor speech evaluation revealed minimal impairments. (Tr. 1212). Ms. Robinson's speech was completely intelligible, though Ms. Robinson noted she feels "tongue-tied" at times. (*Id.*). A cognitive linguistic evaluation showed minimal impairment. (*Id.*). On discharge, the speech therapist noted Ms. Robinson demonstrated an increase in intelligibility with a slight reduction in rate and coordination. (Tr. 1214). Upon Ms. Robinson's request, she was discharged to home on April 2, 2019. (Tr. 1171).

On April 8, 2019, Ms. Robinson met with her primary care physician, Joseph Iemma, M.D. (Tr. 1229). Ms. Robinson reported that her speech came back after the stroke, but it remained a bit slow, and she continued to have some right-sided weakness. (*Id.*). On May 8, 2019, Dr. Iemma referred Ms. Robinson for occupational and physical therapy evaluation and treatment. (Tr. 1242).

On May 21, 2019, Ms. Robinson attended a physical therapy evaluation. (Tr. 1269). She presented with diminished right lower extremity strength, gait issues, pain when on her feet, and balance issues. (*Id.*). Ms. Robinson reported right-sided knee and calf cramping when walking and some intermittent chronic neck pain. (Tr. 1270). Ms. Robinson displayed poor weight-bearing

ability on the right leg due to instability of the right genu recurvatum, complained of knee pain, and took small and slow steps. (*Id.*).

On May 23, 2019, Ms. Robinson attended an occupational therapy evaluation. (Tr. 1266). In comparison to the left hand, Ms. Robinson's right hand showed diminished lateral pinch strength, diminished grip strength, and impaired coordination. (Tr. 1267-268).

On June 14, 2019, Ms. Robinson's physical therapist noted difficulty with flexibility and right knee motor control/strength. (Tr. 1264). Ms. Robinson reported continued right knee and leg cramping. (Tr. 1265). Ms. Robinson attended an occupational therapy session on the same day, where the therapist noted she fatigued quickly when using an arm bike for five minutes. (Tr. 1263).

On June 26, 2019, Ms. Robinson demonstrated improved activity tolerance during her occupational therapy session. (Tr. 1260). On July 3, 2019, Ms. Robinson showed improvements in range of motion and grip strength testing but continued to be limited with reaching behind her back, using her hand while her arm is at shoulder level, cooking, dressing, gripping, and pinching. (Tr. 1259).

On July 17, 2019, the physical therapist noted Ms. Robinson exhibited difficulty with right lower extremity weakness and decreased quad control but showed improvements in gait pattern with her new ankle foot orthotic (AFO). (Tr. 1256). She continued to be limited with rising from a chair, standing, walking, stair negotiation, heavy exertion, physical activities, recreational activities, cooking, and cleaning. (*Id.*). On July 23, 2019, Ms. Robinson demonstrated improvement in strength and right knee control.

On July 26, 2019, Ms. Robinson met with Joseph Little, M.D., at the Brain Center for a consultation regarding her balance, walking, and difficulty articulating speech. (Tr. 1286). Dr. Little noted Ms. Robinson was able to walk up an 18-step flight of stairs, sit, stand, walk, lift, and carry objects without difficulty. (Tr. 1287). Examination revealed normal attention span, concentration, and fund of knowledge. (*Id.*). Ms. Robinson displayed hyperreflexia in the right upper and lower extremities and mild dysdiadochokinesia[1] at the right elbow and wrist. (Tr. 1288). Dr. Little assessed Ms. Robinson as unsteady on her feet, and he recommended therapy to improve sensorimotor integration of visual, vestibular, and proprioceptive pathways. (Tr. 1289).

On November 5, 2019, Ms. Robinson followed up with Dr. Iemma , at which she complained of feeling tired and having poor endurance. (Tr. 1321). Dr. Iemma noted Ms. Robinson continued to wear the AFO brace on her right leg. (*Id.*). On examination, Ms. Robinson's speech was clear and appropriate, her motor strength and coordination were normal, and sensation was grossly intact to light touch. (Tr. 1321-22). She reported her mood was okay overall. (Tr. 1322). Dr. Iemma continued Ms. Robinson on her current medication regimen, including potassium chloride, Plavix, hydrochlorothiazide, metoprolol tartrate, hydralazine HCL, Atorvastatin, Sinemet, triamcinolone acetonide, and fluticasone propionate.[2] (Tr. 1323).

---

[1]     Dysdiadochokinesia is the inability to perform rapid alternating muscle movements. It is a form of ataxia that leads to loss of coordination of speech and limbs. *Dysdiadochokinesia* [updated August 30, 2021], http://www.ncbi.nlm.nih.gov/books/ NBK559262/ (last accessed Sept. 6, 2022).

[2]     Plavix is an anticoagulant. Hydrochlorothiazide, metoprolol tartrate, hydralazine HCL, and are used to treat hypertension. Atorvastatin is used to lower cholesterol. Sinemet is a dopamine promoter and is used to treat Parkinson-like symptoms such as shakiness, stiffness, and difficulty moving. Triamcinolone acetonide is a corticosteroid used to treat various skin conditions. Fluticasone propionate is used to treat asthma and chronic obstructive pulmonary disease. *Drug Finder,* Attorney's Medical Deskbook, 4th Ed. (last updated October 2021).

On January 9, 2020, Ms. Robinson returned to physical therapy after five months of no attendance due to transportation and insurance issues. (Tr. 1327). Ms. Robinson reported functional limitations in rising from a chair, standing, walking, stair negotiation, heavy exertion, physical activities, recreational activities, lifting, sleeping, working, and cleaning. (Tr. 1328). She also reported three falls due to lower extremity fatigue. (*Id.*). Ms. Robinson stated she can be on her feet for ten minutes at a time. (*Id.*). She described pain in both legs when on her feet. (*Id.*). The therapist noted mildly decreased bilateral lower extremity strength, a slow walking cadence with decreased weight shift and difficulty controlling the right knee from hyperextension. (Tr. 1330).

Ms. Robinson continued to demonstrate difficulty with knee stability and flexibility on January 14, 17, 21, and 29, 2020. (Tr. 1341, 1347, 1352, 1358). On February 5, 2020, Ms. Robinson demonstrated improvement in right foot and ankle movement, but the therapist noted continued weakness. (Tr. 1365). On February 10th, Ms. Robinson demonstrated difficulty with right knee hyperextension and balance on uneven and compliant surfaces. (Tr. 1371).

On June 5, 2020, Ms. Robinson underwent a lower extremity EMG. (Tr. 1382). The nerve conduction study was within normal limits. (Tr. 1383).

III.  **MEDICAL OPINIONS**

**Joshua Magleby, Ph.D.** On August 8, 2019, Ms. Robinson met with Joshua Magleby, Ph.D., for a consultative psychological examination. (Tr. 1299). Ms. Robinson endorsed feeling depressed most of the time. (Tr. 1300). She used to have anxiety attacks, but the last occurred about two years before the examination. (*Id.*). Ms. Robinson expressed concern for stuttering but reported "it's gotten better." (Tr. 1301). She also endorsed difficulty "finding words sometimes."

(*Id.*). Ms. Robinson reported being mostly capable of independent activities of daily living, including dressing, bathing, and take care of personal hygiene needs. (*Id.*).

On mental status examination, Ms. Robinson was alert and oriented. (*Id.*). Dr. Magleby noted: "Limitations or restrictions due primarily to psychiatric conditions is minimal." (*Id.*). Her gait was "mildly encumbered" without ataxia. (*Id.*). Dr. Magleby found that Ms. Robinson's word finding was normal without aphasia and her speech articulation was typically clear without dysarthria. (Tr. 1302). Dr. Magleby noted Ms. Robinson stuttered "here and there" during a cognitive test in which she was tasked with counting backwards from twenty. (*Id.*). Otherwise, Dr. Magleby determined Ms. Robinson's ability to understand and comprehend simple and complex language and directions was good. (*Id.*). Ms. Robinson did not display clear symptoms of attentional deficits and mental processing speed was fairly average overall. (Tr. 1303). Dr. Magleby's diagnostic impression was that Ms. Robinson had persistent depressive disorder, unspecified anxiety disorder, and unspecified neurocognitive disorder. (*Id.*).

Dr. Magleby determined Ms. Robinson's ability to understand, remember, and carry out simple instructions is similar compared to other adults. (Tr. 1304). He found Ms. Robinson's abilities in comprehension, memory, and following complex instructions to be fairly average. (*Id.*). However, based on Ms. Robinson's stuttering while counting backwards from twenty, Dr. Magleby determined Ms. Robinson's semantic fluency (a language-based skill) "more impaired." (*Id.*). He found Ms. Robinson's abilities to concentrate and maintain attention, maintain pace, and perform a simple repetitive task were fairly average compared to other adults. (*Id.*). Dr. Magleby determined Ms. Robinson's ability to relate to others was somewhat impaired based on her statement that her past relationships with co-workers was usually fair, but poor with supervisors. (*Id.*). During the

11

evaluation, Ms. Robinson's social relating was fairly appropriate overall "but with some possible anxiety observed." (*Id.*). Finally, Dr. Magleby determined Ms. Robinson's ability to withstand stress and pressures associated with work activity were "somewhat impaired by what appear to be severe and persistent depression symptoms but also by possible anxiety in social situations." (*Id.*).

**Mark Vogelgesang, M.D.** On August 12, 2019, Ms. Robinson met with Mark Vogelgesang, M.D., for a consultative physical examination. (Tr. 1306). Ms. Robinson reported that the March 2019 stroke affected her speech but has improved since then. (*Id.*). Ms. Robinson also claimed that she spoke at a slower pace than before the stroke. (*Id.*). She endorsed "slight strength loss in the upper right extremity and right lower extremity," fatigue after walking 200 feet, and untreated right leg pain. (Tr. 1306-07). Ms. Robinson also reported an occasional need to search for words. (Tr. 1307).

Ms. Robinson indicated she can sit for hours, stand for about ten minutes before her right knee starts to buckle, walk about 200 yards before needing to rest, and lift 20-25 pounds. (*Id.*). She endorsed usually being able to dress herself but reported occasional difficulty with shoes and socks on the right side. (*Id.*). Ms. Robinson can usually cook but gets tired and occasionally has difficulty grasping items in her right hand. (Tr. 1308). She can clean but has difficulty with vacuuming because it hurts her right leg. (*Id.*).

On physical examination, Ms. Robinson showed good range of motion in all joints but with diminished strength (4-5+) in the right upper and lower extremities. (Tr. 1309). Her right hand functioned normally but was slightly weaker than her left hand. (*Id.*). Dynamometer testing showed right-handed grip strength between eight and ten pounds, and left-handed grip strength between twenty-six and thirty-six pounds. (Tr. 1311). During testing, Ms. Robinson could pick up a

tongue blade and hold a jar top but could not hold a heavy jar in her right hand. (*Id.*). There were, however, no signs of muscle spasm, spasticity, or muscle atrophy. (*Id.*). Gait analysis revealed mild weakness in the right foot. (*Id.*). Dr. Vogelgesang opined Ms. Robinson could possibly tolerate a sedentary position until her right leg function improves further. (Tr. 1310).

**Bruce Mirvis, M.D.** On August 29, 2019, Bruce Mirvis, M.D., a state agency medical consultant, reviewed Ms. Robinson's medical records and the opinions of Drs. Magleby and Vogelgesang and assessed her residual functional capacity (RFC). (Tr. 335-41). Dr. Mirvis found the medical opinions of Drs. Magleby and Vogelgesang to be supported and consistent with the evidence of record. (Tr. 338-39). He concluded Ms. Robinson can lift twenty pounds occasionally, ten pounds frequently; stand and/or walk for four hours; sit for about six hours of an eight-hour workday; occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; limited to frequent handling and fingering with the right upper extremity; avoid all exposure to hazardous machinery, heights, and commercial driving. (Tr. 339-41). Dr. Mirvis identified the following evidence to support his opinion:

> She says she has occasional difficulty with walking secondary to her mild foot drop. BP 196/111. Had no difficulty getting onto the exam table. Heart regular sinus rhythm. Lungs clear to auscultation. Abdomen very soft, non-tender, no organomegaly. No back tenderness on palpation to spine, had good [range of motion] of neck. Had good [range of motion] of all joints. Had good strength on left side. Had 4-5+ strength on right upper extremity and right lower extremity. Right hand is weaker than left. Unlimited mobility of left hand. Right hand occasionally has difficulty with buttons and heavy objects. Was able to pick up a tongue blade, hold a jar top, but not able to hold a heavy jar with right hand. Gait shows mild weakness of the right foot. Hell to toe was slightly unsteady. Wearing AFO on right foot. She was able to dorsiflex and plantar flex her right foot and also was able to have good eversion and inversion. Had normal sensation of upper and lower extremities.

(Tr. 339-40).

**Stephen Koch, M.D.** On December 9, 2019, Stephen Koch, M.D., a state agency medical consultant, reconsidered Ms. Robinson's claim and found the prior administrative medical findings from Dr. Mirvis' review consistent and well support by objective evidence. (Tr. 357). However, Dr. Koch determined Ms. Robinson could frequently balance, stoop, and kneel. (Tr. 355). Otherwise, Dr. Koch adopted Dr. Mirvis' assessment. (Tr. 354-57).

**Cynthia Waggoner, Psy.D.** On September 6, 2019, Cynthia Waggoner, Psy.D., a state agency psychological consultant, performed a mental RFC assessment and found some moderate limitations in Ms. Robinson's abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. (Tr. 342). Dr. Waggoner opined Ms. Robinson "is capable of superficial social interactions," and would work best in an environment that does not have strict production standards. (*Id.*).

**Janet Souder, Psy.D.** On December 11, 2019, Janet Souder, Psy.D., a state agency psychological consultant, reconsidered Ms. Robinson's claim and determined the prior administrative findings were consistent and well supported by objective evidence and adopted Dr. Waggoner's mental RFC assessment. (Tr. 357-58). Dr. Souder noted her review of the medical records did not reveal any significant change in behavior or mental status but showed continued mild residual speech issues and right-sided weaknesses. (Tr. 358).

**Joseph Iemma, M.D.** On July 7, 2020, Dr. Iemma completed an assessment form and opined Ms. Robinson could stand/walk for a total of one hour in an eight-hour work day; sit for a total of two hours in an eight-hour workday; lift and carry five pounds occasionally and one pound

frequently; less than occasionally balance; never climb, stoop, crouch, kneel, or crawl; frequently handle and finger, occasionally reach, and less than occasionally push/pull.

## IV.    OTHER RELEVANT EVIDENCE

Ms. Robinson completed an Adult Function Report, dated May 14, 2019. (Tr. 457-64). Ms. Robinson reported being unable to work because the stroke left her with subsequent weakness on her right side. (Tr. 457). On a typical day, Ms. Robinson wakes up, bathes, fixes breakfast for herself, and goes to medical appointments. (Tr. 458). Ms. Robinson's family helps her perform household chores including cleaning, laundry, and dishes, and she prepares dinner. (Tr. 458-59). Ms. Robinson shops for food and household items in stores and online. (Tr. 460). Ms. Robinson goes shopping two or three times a month. (*Id.*). She is able to pay bills and handle her finances. (*Id.*).

Before the stroke, Ms. Robinson endorsed reading and being able to walk long distances. (Tr. 461). Since the stroke, Ms. Robinson finds walking to be a challenge and is limited to walking 100 feet before needing to stop and rest. (Tr. 462). She does not read as much because the stroke affected her cognitive abilities. (Tr. 461). Ms. Robinson does not drive because her predominant side (right) is not strong enough to control the vehicle. (Tr. 460).

Ms. Robinson continues to have muscle spasms related to the stroke. (Tr. 458). The spasms disrupt her sleep schedule and wake her up. (*Id.*). Ms. Robinson endorses continued weakness and difficulty controlling her right hand, making bathing, haircare, shaving, and toileting a challenge. (*Id.*).

THE ALJ'S DECISION

The ALJ's decision, dated September 22, 2020, included the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since April 17, 2019, the application date (20 CFR 416.971 *et seq*).

2.  The claimant has the following severe impairments: status post stroke, right foot drop, essential hypertension, neurocognitive disorder, depression, and anxiety (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she can occasionally use foot controls bilaterally. She can never climb ladders, ropes, or scaffolds. She can occasionally kneel, crawl, and climb ramps and stairs. The claimant can frequently balance, stoop, and crouch. She must avoid workplace hazards, such as unprotected heights or exposure to dangerous moving machinery. She can perform simple routine tasks that do not involve arbitration, negotiation, or confrontation. She cannot direct the work of others or be responsible for the safety or welfare of others. The claimant can do not piece rate work or assembly line work.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on February 5, 1973, and was 46 years old, which is defined as a younger individual age 45-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education. (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 17, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 289-99).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference.

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Robinson claims the ALJ erred by failing to include in the RFC (i) limitations for handling and fingering and (ii) limitations to address her diagnosed neurocognitive disorder. (Pl.'s Br., ECF #9, PageID 1431, 1435). The Commissioner responds that the ALJ reasonably did not include right arm manipulative limitations and that Ms. Robinson does not demonstrate that

additional limitations for her neurocognitive impairment were warranted. (Comm'r's Br., ECF #13, PageID 1466, 1471).

The ALJ alone is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Id.* at 632. It is the claimant's burden to prove her functional limitations. *Jones,* 336 F.3d at 474. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* The ALJ is not required to implement all suggested limitations and may impose more restrictions than are set forth in a medical opinion. Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

**Manipulative Limitations**

Ms. Robinson believes the ALJ erred in declining to add manipulative limitations to the RFC because "the record amply documents the need for such limitations." (ECF #9, PageID 1433). For support, she points to the opinions of Drs. Mirvis and Iemma limiting her to frequent handling and fingering, Dr. Vogelgesang's dynamometer grip strength readings showing weakness in the right hand, a neurological evaluation at the Brain Center, and occupational therapy records.

(*Id.*). Ms. Robinson does not claim the ALJ ignored or did not consider any of this medical evidence, nor does she argue the ALJ improperly evaluated any of the relevant medical opinions, and therefore, she has not demonstrated that the ALJ applied an incorrect legal standard. At most, Ms. Robinson has demonstrated that there is some evidence in the record that might support a manipulative limitation, but it bears repeating, even if substantial evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477.

Moreover, substantial evidence supports the ALJ's reason for declining to include manipulative limitations. The ALJ addressed Dr. Mirvis' opinion that Ms. Robinson could frequently handle and finger, stating that the record failed to document substantial or appreciative problems with manipulative function. (Tr. 296-97). Indeed, the ALJ cited objective medical findings of normal or mildly diminished upper extremity motor strength and Dr. Vogelgesang's findings of "slightly weaker" right hand strength, derived from dynamometer grip strength testing, but normal hand function. (Tr. 296, 297). In light of those findings, Dr. Vogelgesang's opinion did not provide for a manipulative limitation. The ALJ did not adopt Dr. Iemma's opinions, including the limitation to frequent handling and fingering, because Dr. Iemma's own treatment notes did not support the opined limitations. (Tr. 297). In Dr. Iemma's most recent treatment note of November 5, 2019, Ms. Robinson complained of fatigue, poor endurance, and still wearing the AFO on her right leg; she did not complain of right-hand dysfunction, limitation, or pain and exhibited normal bilateral upper extremity strength. (Tr. 1321).

Ms. Robinson did not identify any applicable legal standard the ALJ did not apply in assessing her RFC and the ALJ's reasons for not adopting the manipulative limitations are supported by substantial evidence. Ms. Robinson is not entitled to remand on this basis.

**Limitation to Address a Neurocognitive Disorder**

Ms. Robinson next claims the ALJ erred by not including any mental limitations in the RFC despite his determination that the neurocognitive disorder is a severe impairment at Step Two of the sequential analysis. (ECF #9, PageID 1435). She appears to be arguing that a finding of a severe impairment at Step Two necessitates that some limitation addressing that severe impairment must be incorporated into the RFC.

Ms. Robinson's argument misstates the relationship between the ALJ's Step Two findings and the determination of a claimant's RFC. A determination that an impairment is "severe" at Step Two means only that the impairment has "more than a minimal effect" on the claimant's ability to do basic work activities. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting SSR 96-3p). But a finding that an impairment is "severe" at Step Two does not mandate a finding that there are functional limitations stemming from that impairment. *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *see also Simpson v. Comm'r of Soc. Sec.*, No. 1:13-cv-649, 2014 WL 3845951, at *9 (S.D. Ohio Aug. 5, 2014) ("Put another way, the existence of a severe impairment says nothing as to its limiting effects."); *Walz v. Comm'r of Soc. Sec.*, 1:18-cv-1375, 2019 WL 1989624, *8 (N.D. Ohio May 6, 2019) ("Here, the ALJ's threshold finding that Walz's agoraphobia was a severe impairment at Step Two did not require the ALJ to find that Walz had functional limitations due to her agoraphobia at Step Four.").

In a similar fashion, Ms. Robinson argues the ALJ erred in concluding she had a moderate limitation in her ability to concentrate, persist, or maintain pace, a finding made at Step Three of the sequential analysis, while failing to include limitations in the RFC to account for her difficulty with finding words and stuttering. (ECF #9, PageID 1436). She claims the mental health limitations in the RFC do not adequately address her cognitive difficulties. (*Id.*). The Commissioner responds that Ms. Robinson did not demonstrate that other limitations were warranted, nor did she cite any medical opinion imposing greater limitations to address cognitive issues. (ECF #13, PageID 1471). Here, the ALJ's RFC limited Ms. Robinson to performing simple routine tasks that do not involve arbitration, negotiation, or confrontation; restricted her from directing the work of others or being responsible for the safety and welfare of others; and restricted her from piece rate or assembly line work. (Tr. 293).

Courts in the Sixth Circuit have held an ALJ is not required to include paragraph B findings in the RFC. *See, e.g., Pinkard v. Comm'r of Soc. Sec. Admin.*, 1:13CV1339, 2014 WL 3389206, at *10 (N.D. Ohio July 9, 2014) ("[T]he ALJ does not have to include paragraph B finding in his RFC finding. Paragraph B findings under the listings are findings at step three of the sequential evaluation process, and are not RFC findings pertaining to steps four and five of the sequential evaluation process."); SSR 96-8P. Thus, I find the ALJ did not err by omitting the paragraph B findings in forming the RFC.

Moreover, I agree with the Commissioner that Ms. Robinson has not shown her mental health impairments warrant any further limitation. Ms. Robinson emphasizes the diagnosis of unspecified neurocognitive disorder Dr. Magleby made at the consultative psychological examination. The diagnosis is based on an instance of stuttering while counting backwards from

23

twenty and Ms. Robinson's report that she occasionally struggles to find words. (*See* ECF #9, PageID 1435). She would have the ALJ include restrictions to address her difficulty with finding words and stuttering, such as a restriction from dealing with the public or communicating generally. (*Id.* at PageID 1437). However, Ms. Robinson did not point to any medical opinion supporting the adoption of more restrictive limitations into the RFC; even Dr. Magleby, who diagnosed the neurocognitive disorder, did not indicate Ms. Robinson required restrictions to address her stuttering or reported difficulty finding words.

In addition, the ALJ's reasons for not adopting a restriction from working with the public or communicating in general are supported by substantial evidence. The ALJ concluded Ms. Robinson's neurological functioning appeared to generally stabilize. (Tr. 297). The record supports this: Ms. Robinson's first speech therapy evaluation after the stroke revealed minimal impairments. (Tr. 1212). Though Ms. Robinson claimed to feel "tongue-tied" at times, her speech was completely intelligible. (*Id.*). A cognitive linguistic evaluation also revealed minimal impairment. (*Id.*). On discharge from the inpatient skilled nursing facility, the speech therapist noted Ms. Robinson demonstrated increased intelligibility with only a slight reduction in rate and coordination. (Tr. 1214). During the neurological evaluation at the Brain Center, Ms. Robinson spoke in complete sentences without issue, did not demonstrate indications of aphasia, and was described as "appropriately and pleasantly interactive." (Tr. 1287). During the examination with Dr. Magleby, the doctor noted Ms. Robinson demonstrated average communication and normal word finding.

Ms. Robinson has not shown the ALJ applied an incorrect standard and the ALJ's decision is supported by substantial evidence. As such, Ms. Robinson is not entitled to a reversal of the Commissioner's decision.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying SSI.

Dated: September 12, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE